**CARPET GROUP INTERNATIONAL and Emmert Elsea, Plaintiffs,**

v.

**ORIENTAL RUG IMPORTERS ASSOCIATION, INC., et al., Defendants.**

**No. CIV.A. 95–5574(JAG).**

United States District Court, D. New Jersey.

Feb. 28, 2003.

Glenn A. Mitchell, Esq., David U. Fierst, Esq., Stein, Mitchell & Mezines, L.L.P., Washington, D.C., Donald Robinson, Esq., Robinson, Lapidus & Livelli, Newark, NJ, for Plaintiffs.

Howard M. Nashel, Esq., Nashel Kates Nussman Rapone Ellis & Traum, LLP, Hackensack, NJ, for Defendant Bashian Bros., Inc.

Arthur M Lieberman, Esq., Keith D. Nowak, Esq., James P. Lynn, Esq., Abbey Green, Esq., Lieberman & Nowak, LLP, New York, NY, for Defendants Moussa Etessami & Sons Corp. and Isaac Etessami.

Michael Ira Asen, Esq., Olonoff, Asen & Olonoff, LLP, New York, NY, for Defen-

dants Eugene Newman and Noonoo Rug Co., Inc.

## OPINION

GREENAWAY, District Judge.

These matters come before the Court on three separate motions for summary judgment of defendant Bashian Bros., Inc. ("Bashian Bros."), defendants Isaac Etessami ("Etessami") and Moussa Etessami & Sons Corporation ("Etessami & Sons") (collectively, "Etessami Defendants"), and defendants Eugene Newman ("Newman") and Noonoo Rug Company ("Noonoo") (collectively "Newman Defendants").[1] For the reasons set forth below, this Court denies the Newman Defendants' motion and grants Bashian Bros.' motion as to each of Plaintiffs' claims. This Court denies the Etessami Defendants' motion as to Plaintiffs' section 1 and section 2 conspiracy to monopolize claims. Finally, this Court grants the Etessami Defendants' motion for summary judgment as to Plaintiffs' monopolization, attempted monopolization, and tortious interference claims.

## BACKGROUND [2]

Plaintiff Elsea is the sole shareholder of Carpet Group. Carpet Group is a Virginia

---

1. Defendant Oriental Rug Importers Association ("ORIA") joined in the instant motions. (Tr. at 4.) ("Tr." refers to the transcript of oral argument on October 16, 2001.). However, neither Bashian Bros., the Etessami Defendants, nor the Newman Defendants have briefed the issues with regard to ORIA. For example, this Court notes that no party has briefed the issue of whether the illegal actions of ORIA's members may be imputed to ORIA itself, which is distinct from the issue of whether the conduct of ORIA's officers may be attributed to their respective companies. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 570, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (determining that a professional association could be held liable for the actions of its

officers and agents taken with apparent authority). Moreover, in the absence of such briefing, Plaintiffs have had no opportunity to respond to the contention that ORIA may not be held liable for the actions of its officers. Accordingly, this Court will not determine, at this time, whether ORIA is entitled to a grant of summary judgment as to Plaintiffs' claims.

2. The procedural and factual history of this case, extending back to 1995, has been described at length in the prior opinion of the Third Circuit, *Carpet Group International v. Oriental Rug Importers Assoc., Inc.*, 227 F.3d 62 (3d Cir.2000), and the Reports and Recommendations of the Honorable G. Donald Haneke, U.S.M.J., dated February 11, 1998, and

corporation in the business of arranging the sale of oriental rugs from foreign manufacturers to retailers in the United States.

Defendant Bashian Bros. is an importer and wholesaler of oriental rugs. Bashian Bros. is a member of the Oriental Rug Importers Association, Inc. ("ORIA"), a trade association comprised of importers and wholesalers of oriental rugs. George G. Bashian, Jr. ("Bashian"), president of Bashian Bros., was at all relevant times on the executive board of ORIA.[3] Defendant Etessami & Sons was a small, family-owned and operated oriental rug wholesaler, and a member of ORIA.[4] Etessami, at all relevant times, was the secretary/treasurer of Etessami & Sons. Etessami was also the president of Defendant ORIA in 1992 and 1993. Defendant Noonoo is an importer of oriental rugs, and a member of ORIA. Defendant Newman is the president of Noonoo.

The American oriental rug market typically involves manufacturers in countries such as Pakistan, Turkey and India, and wholesalers who import the rugs to the United States and then sell the rugs to retailers who sell them to the public. Plaintiffs believe that the importing of rugs through wholesalers then to retailers causes higher rug prices. In response, Plaintiffs created a method to bypass the wholesalers by: (1) taking U.S. retailers on buying trips to the countries where the rugs are produced where they could purchase the rugs directly from the manufacturers; and (2) operating trade shows in the United States where foreign manufacturers could sell directly to retailers.

Plaintiffs excluded wholesalers, such as Defendants, from these trade shows.

Plaintiffs claim that Defendants conspired to sabotage their efforts to facilitate direct sales between foreign manufacturers and U.S. retailers and specifically, conspired to wreck Plaintiffs' trade shows. Plaintiffs offer evidence unveiling the activity of ORIA and its members to convince foreign governments, foreign rug trade associations and one domestic rug retailers' association not to provide financial assistance to two Carpet Group trade shows in November 1993 and August 1994. Plaintiffs also offer documentary evidence intending to show that the defendants were boycotting domestic retailers and foreign manufacturers who supported Plaintiff's trade shows. Plaintiffs provide two declarations of Elsea, in which he avers several incidents intending to illustrate ORIA's pressure on its members to distance themselves from Carpet Group's trade fairs. Specifically, Plaintiffs point to various correspondence to show that ORIA and the individual rug importers had pressured independent trade publications to reject advertising for the trade show. Finally, Plaintiffs offer evidence of ORIA's historical efforts to prevent foreign manufacturers from selling directly to U.S. retailers.

Based on the above, Plaintiffs filed the instant action on October 30, 1995. In their Second Amended Complaint, filed September 18, 1997, Plaintiffs allege violations of sections 1 and 2 of the Sherman Act, as well as tortious interference with prospective business relations and tortious interference with contracts.

---

June 2, 1998. The facts below are extrapolated from these sources.

**3.** Bashian is not a named defendant in this case.

**4.** On January 1, 2000, Etessami & Sons closed its business. The corporate entity still exists, however, in part to collect outstanding accounts receivable. (Issac Etessami Decl. ¶ 4.)

Soon thereafter, Defendants moved to dismiss the action for lack of subject matter jurisdiction, arguing that the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, deprived this Court of subject matter jurisdiction. This Court referred the motion to Magistrate Judge G. Donald Haneke, who submitted a report and recommendation urging dismissal. Based on subsequent submissions of additional evidence by the parties, the matter was remanded back to Judge Haneke for further evaluation. In his supplemental report and recommendation, Judge Haneke affirmed his original report. On October 29, 1999, this Court adopted both reports and dismissed Plaintiffs' complaint for lack of subject matter jurisdiction. Plaintiffs appealed. The Third Circuit reversed the dismissal, concluding that: (1) the FTAIA did not divest this Court of subject matter jurisdiction; (2) subject matter jurisdiction existed over Plaintiffs' Sherman Act claims; and (3) Plaintiffs had antitrust standing. *Carpet Group,* 227 F.3d at 78.

On remand, this Court is now presented with the motions for summary judgment, pursuant to FED. R. CIV. P. 56(c), of several of the Defendants.[5] Bashian Bros. seeks summary judgment against Plaintiffs' Sherman Act claims on the basis that there is no evidence suggesting that it was a part of any conspiracy to restrain trade or that it monopolized, attempted to monopolize, or conspired to monopolize the importing and wholesale distribution of oriental rugs in the United States. Bashian Bros. also seeks summary judgment as to Plaintiffs' tortious interference claims.

The Etessami Defendants' summary judgment motion is based on the following: (1) Plaintiffs cannot establish the elements of conspiracy, as required by section 1 of the Sherman Act; (2) Plaintiffs cannot establish the elements of monopolization, in violation of section 2 of the Sherman Act; and (3) Plaintiffs cannot establish the elements of tortious interference with prospective business relations or tortious interference with contracts. The Etessami Defendants also claim that some of the correspondence relied upon by Plaintiffs are petitions to governmental entities or public officials, and thus are protected from antitrust liability under the *Noerr–Pennington* doctrine.

Similarly, the Newman Defendants seek summary judgment, claiming that their actions are protected by the *Noerr–Pennington* doctrine.

## STANDARD OF REVIEW

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994); *Nat'l State Bank v. Fed. Reserve Bank of N.Y.,* 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and

---

5. Defendants Pande Cameron & Co. of New York, Kelaty Rugs International, and Daniel Hodges are not parties to the instant motions for summary judgment.

instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990); *see also* FED. R. CIV. P. 56(e) (requiring the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir.1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences-including on issues of credibility-in favor of the non-moving party. *Watts v. Univ. of Del.*, 622 F.2d 47, 50 (3d Cir.1980).

■ Although the "traditional summary judgment standard applies with equal force in antitrust cases," the meaning attributed to circumstantial evidence will vary depending upon the challenged conduct. *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1001 (3d Cir.1994) (citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). For instance, "evidence of conduct which is 'as

consistent with permissible competition as with illegal conspiracy,' without more, does not support an inference of conspiracy." *Id.* at 1001 (quoting *Matsushita*, 475 U.S. at 597 n. 21, 106 S.Ct. 1348). In comparison, where the "alleged conduct is 'facially anticompetitive and exactly the harm the antitrust laws aim to prevent,' no special care need be taken in assigning inferences to circumstantial evidence." *Id.* (quoting *Eastman Kodak*, 504 U.S. at 478, 112 S.Ct. 2072.) Accordingly, where an antitrust plaintiff has only proffered ambiguous evidence, "the Supreme Court has required [that plaintiff submit] 'evidence tending to exclude the possibility' of independent action, i.e., 'direct or circumstantial evidence that reasonably tends to prove that the alleged conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.* (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)).

## ANALYSIS

### I. Noerr–Pennington Doctrine

■ In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court held that antitrust liability cannot be predicated solely on petitioning to secure government action even where those efforts are intended to eliminate competition. The Noerr–*Pennington* doctrine thus protects citizens from being penalized for exercising their first amendment right to petition the government. The doctrine extends to persons who petition all types of governmental entities, including legislatures, administrative agencies and courts. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct.

609, 30 L.Ed.2d 642 (1972). In fact, the *Noerr* Court described only one exception to this immunity, often named the "sham" exception: "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. 523.

■ In later cases, the Supreme Court refined the applicability of the *Noerr–Pennington* doctrine to anticompetitive behavior. In *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), the Court explained:

> The scope of [the *Noerr–Pennington* ] protection depends ... on the source, context, and nature of the anticompetitive restraint at issue. Where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint. In addition, where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is incidental to a valid effort to influence governmental action. 486 U.S. at 499, 108 S.Ct. 1931 (citations omitted).

The Supreme Court's decision in *Allied Tube* also highlighted the boundaries of the term "governmental action." In determining whether a private organization which set and published product standards and codes related to fire protection engaged in governmental action, the Court reasoned,

> [T]he Association cannot be treated as a "quasi-legislative" body simply because legislatures routinely adopt the Code the Association publishes. Whatever *de facto* authority the Association enjoys, no official authority has been conferred on it by any government, and the decision-making body of the Association is composed, at least in part, of persons with economic incentives to restrain trade. We may presume, absent a showing to the contrary, that a government acts in the public interest. A private party, on the other hand, may be presumed to be acting primarily on his or its own behalf. The dividing line between restraints resulting from governmental action and those resulting from private action may not always be obvious. But where ... the restraint is imposed by persons unaccountable to the public and without official authority, many of whom have personal financial interests in restraining competition, we have no difficulty concluding that the restraint has resulted from private action. 486 U.S. at 501–02, 108 S.Ct. 1931 (citations omitted).

Although a Noerr–*Pennington* defense may not be dismissed on the ground that the conduct at issue did not involve "direct" petitioning of governmental officials, the doctrine does not immunize every concerted effort that is genuinely intended to influence governmental action. *Id.* at 503, 108 S.Ct. 1931. Rather, "the *Noerr* immunity of anticompetitive activity intended to influence the government depends not only on its impact, but also on the context and nature of the activity." *Id.* at 504, 108 S.Ct. 1931. Where such activity is essentially political, and cannot be segregated from the activity's impact on business, it is protected. *Id.* at 505, 108 S.Ct. 1931. Conversely, where such activity does "not take place in the open political arena, where partisanship is the hallmark of decisionmaking," *id.* at 493, 108 S.Ct. 1931, and

"can be more aptly characterized as commercial activity with a political impact," the Noerr–*Pennington* doctrine does not apply. *Id.* at 507, 108 S.Ct. 1931.

In *FTC v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) ("*SCTLA*"), the Supreme Court reiterated that anticompetitive behavior "is not outside the coverage of the Sherman Act simply because its objective was the enactment of favorable legislation." 493 U.S. at 424, 110 S.Ct. 768. *SCTLA* involved a boycott by a group of lawyers in private practice who acted as court-appointed counsel for indigent defendants in criminal cases in the District of Columbia which was aimed at forcing the District to increase hourly compensation. In response to the boycott, the Federal Trade Commission filed suit, complaining that the *SCTLA* engaged in a classic restraint of trade in violation of the Sherman Act. Defendants claimed *Noerr–Pennington* immunity.

The Court clarified *Noerr*'s holding that "no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws," stressing that "in the *Noerr* case the alleged restraint of trade was the intended *consequence* of public action; in this case the boycott was the *means* by which respondents sought to obtain favorable legislation." 493 U.S. at 424–25, 110 S.Ct. 768 (emphasis in original) (citing *Noerr*, 365 U.S. at 135, 81 S.Ct. 523). The Court concluded that defendants' concerted action in refusing to accept further assignments until their fees were increased was a plain violation of the antitrust laws. *Id.* at 428, 110 S.Ct. 768. Thus, in *SCTLA*, the Court distinguished between a restraint resulting from governmental action, which is protected, and a restraint resulting from private action directed at the government, which is not protected.

■ Before evaluating Plaintiffs' antitrust claims, this Court must first determine whether Defendants' behavior is entitled to the *Noerr–Pennington* immunity. At issue are the following communications:

● September 24, 1992 letter from Etessami, as president of ORIA, to a Pakistani Minister of Commerce, copied to the Export Promotion Bureau of Pakistan ("EPB") and the "PCEM Association" (Abbey Green Decl., Ex. 6.);

● July 23, 1993 letter from Etessami, as president of ORIA, to the Secretary of the Carpet Export Promotion Council of India ("CEPC") (*Id.*, Ex. 7.);

● Notes from a September 29, 1993 meeting between George Bashian, Newman and "two Paks" revealed discussions about "respect[ing] the channels of distribution." (*Id.*, Ex. 23.) Bashian testified that Newman gave a lecture at this meeting in which he urged the Pakistani gentlemen present to respect U.S. channels of distribution for oriental rugs.[6] (*Id.*, Ex. 67 at 84.);

● January 18, 1994 fax from Newman, on Noonoo Rug Company letterhead, to the Pakistan Carpet Manufacturers and Exporters Association ("PCMEA") PCMEA, copied to Wool and Carpet Review ("WCR"), EPB, and ORIA (Michael Ira Asen Cert., Ex. B.); and

● March 21, 1994 fax from Newman, on Noonoo Rug Company letterhead, to

---

**6.** Based on the attached letter, one of the Pakistani individuals at the September 29, 1993 meeting was Abu Shamim Ariff, Vice–Chairman of the EPB-whose governmental status Plaintiffs do not challenge. (Fierst Decl., Ex. 23.) Although the identity of the other Pakistani attendee is unclear, to the extent that it constituted lobbying of Pakistani government officials, it is protected by the *Noerr* doctrine.

the Vice–Chairman of the EPB, copied to PCMEA and ORIA (*Id.*, Ex. C.) The Etessami Defendants argue that the 1992 and 1993 letters from ORIA may not constitute the basis for antitrust liability since they are petitions to governmental entities or officials, and therefore such actions are immune based upon the *Noerr–Pennington* doctrine. The Newman Defendants similarly claim that its 1994 faxes are entitled to *Noerr–Pennington* immunity as they were directed to Pakistani government officials.

■ In response, Plaintiffs first challenge whether the PCMEA and the CEPC are actually governmental entities which trigger the applicability of the doctrine. For instance, Plaintiffs assert that the 1992 letter to the Pakistani Minister of Commerce is not entitled to the *Noerr–Pennington* immunity because a copy of the letter was forwarded to the PCMEA, which Plaintiffs contend is not a government agency. Plaintiffs appear to acknowledge that the Minister of Commerce is a public official; however, they argue that forwarding the 1992 letter to PCMEA vitiated the *Noerr–Pennington* protection. Similarly, Plaintiffs urge this Court to deny *Noerr–Pennington* immunity to the March 1994 fax because it was also copied to PCMEA, despite the fact that it was directed to the EPB-whose government status Plaintiffs do not challenge.[7] However, in the absence of supporting legal authority for Plaintiff's position, this Court is constrained to hold that a letter sent to a governmental authority is not exempt from the application of the *Noerr–Pennington* doctrine and its protection simply because such letter was copied to a private party.[8] (Green Decl., Ex. 6 at 3.)

■ With regard to the January 1994 fax, which was in fact directed to the PCMEA, Plaintiffs insist that the PCMEA is not a governmental entity: "[a]s its name reflects, it is a trade association of manufacturers and exporters." (Pl.'s Opp. to Etessami at 26.) As proof of PCMEA's private party status, Plaintiffs highlight Newman's reference to PCMEA as a trade association in his March 1994 letter. In response, Defendants contend that the PCMEA is a quasi-governmental agency, and cite to a letter written by Yacoob H. Salehji ("Salehji"), Chairman of the PCMEA describing the relationship between the PCMEA and Pakistani government:

> There is no "official" government agency for the carpet industry, which is why EPB and the Government of Pakistan rely on PCMEA for direction and advice. PCMEA operates, and historically has operated, as a government agency to the extent that it advises and influences policy; it is involved in all aspects of the Government's role in the carpet industry. (Ira Asen Reply Cert., Ex. A.)

For the reasons expressed by the Supreme Court in *Allied Tube*, this Court nonetheless finds that the PCMEA is a private party under the *Noerr–Pennington* doc-

---

7. *See* Tr. at 40–41 ("Tr." refers to the transcript of oral argument in this matter on October 16, 2001.).

8. Defendants also challenge whether the "PCEM Association," copied in the 1992 letter, is identical to the PCMEA. Without making a determination on this issue, this Court notes that as of 1997, the PCMEA had an address similar to that listed for the PCEM Association in the 1992 letter. For example, the address in the 1992 letter reads: "First Floor Ali Complex, Empress Rd., Lahore, Pakistan." (Green Decl., Ex. 6 .at 3.) In an article listed on the World History Archives, dated June 11, 1997, contact information for the PCMEA was listed as: "Ali Complex, 23 Empress Road, Lahore, Pakistan." (*available at* http://www.hartford-hwp.com/archives/52/012.html.)

trine. *See* 486 U.S. at 501, 108 S.Ct. 1931 ("[W]here ... the restraint is imposed by persons unaccountable to the public and without official authority, many of whom have personal financial interests in restraining competition, we have no difficulty concluding that the restraint has resulted from private action."). For instance, PCMEA is a member of the Federation of Pakistan Chambers of Commerce & Industry ("FPCCI"), which is a corporate body licensed by the Pakistani government. Although Defendants argue that the FPCCI-and thereby PCMEA-is a governmental agency, this Court notes that FPCCI's "primary aim is to promote, encourage, and safeguard the interest of [the] private sector in Pakistan and to serve as a bridge between the business community and the government." (*available at* http://www.g77tin.org/fpccihp.html.)

As a self-described "representative body of the private business and industry," it is clear that PCMEA and other similar associations within the FCPPI are "composed, at least in part, of persons with economic incentives to restrain trade." *Id.; see also Allied Tube,* 486 U.S. at 501, 108 S.Ct. 1931. Importantly, Salehji's assertions, without more, do not demonstrate that the Pakistani government so fully relied upon the PCMEA in formulating oriental rug industry policies such that the PCMEA retained government-like authority. *Cf. Wheeling–Pittsburgh Steel Corp. v. Allied Tube & Conduit Corp.,* 573 F.Supp. 833, 838 (N.D.Ill.1983) (Municipalities' adoption of professional associations' standards and complete reliance on their testing procedures in the promulgation of industry requirements "resulted in a near complete delegation of governmental authority to these otherwise private entities," and thus

established a quasi-governmental agency under *Noerr–Pennington.*).

■ Plaintiffs similarly argue that the CEPC, although involved with the government, is not a government agency. As with the PCMEA, Plaintiffs first note Etessami's own reference to the CEPC as a "trade association" in his July 1993 letter, which begins with the sentence: "We have come to understand that your Trade Association may be considering co-sponsoring a Rug Exhibition to be held in Chicago in November 1993." (Green Decl., Ex. 7.) Plaintiffs also highlight the deposition testimony of ex-ORIA president Dan Hodges ("Hodges"), who stated his understanding that the CEPC is "the conduit between the manufacturer and the government; [i]t is a body made up, I believe, of both government and industry representatives." (Pl.'s Ex. 65 at 98.) Lastly, Plaintiffs point to the Ministry of Textiles website, which along with other Export Promotion Councils, lists the CEPC as one of the "incorporated organisations [sic] of exporters of the products concerned," and states that each group has a nominee of the Ministry of Textiles. (*available at* http://texmin.nic.in/tex_07.htm.) The website also notes that the CEPC's objective is "promotion of exports of carpets" and that the council receives "grant-in-aid from Government [sic] for its export promotion activities like organization of fairs/exhibitions/seminars/buyer seller meets, etc." [9] *Id.*

Based on the above, this Court finds that neither the PCMEA nor the CEPC are government entities, as is required for application of the *Noerr–Pennington* doctrine. The CEPC and PCMEA are listed

---

**9.** Additionally, in his certification, T.S. Chadha, the Executive Director and Secretary of the CEPC, states that although the council was "set up by the Ministry of Textiles and the government of India," it "has a membership of more than 2,500 manufacturers and importers." (T.S. Chadha Cert. ¶ 1.)

as "Export Promotion Councils" and "Industry/Trade Bodies," respectively. (*available at* http://texmin.nic.in/tex_07.htm and http://www.pakistan-korea-trade.org/item-no17.htm.) Rather than governmental entities, the two groups appear to be more akin to ORIA itself, a self-described "National Association of Importers and Wholesalers." (Green Decl., Ex. 6.) The fact that the CEPC has a nominee from the Ministry of Textiles does not make the entire council a governmental agency.[10] Therefore, Defendants' petitioning of PCMEA and CEPC is not protected by the *Noerr–Pennington* doctrine as the lobbying of governmental authorities.

Conversely, Plaintiffs have produced no evidence suggesting that the EPB and Pakistani Minister of Commerce are not government entities and officials. Rather, Plaintiffs contend that, to the extent that the persons contacted by Defendants were public officials, the *Noerr–Pennington* doctrine does not apply to the lobbying of foreign governments. Indeed, there has been some dispute as to whether the doctrine applies to the petitioning of foreign officials. *See, e.g., Dominicus Americana Bohio v. Gulf & Western Industries, Inc.,* 473 F.Supp. 680, 690 n. 3 (S.D.N.Y.1979) ("It is an open question whether [the *Noerr–Pennington*] doctrine ... has any application to the lobbying of foreign governments."); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 108 (C.D.Cal.1971) ("Examination of the premises underlying Noerr indicates that the case's rationales do not readily fit into a foreign context. . . One of the roots of the

*Noerr* decision was a desire to avoid a construction of the antitrust laws that might trespass upon the First Amendment right of petition. The constitutional freedom "to petition the Government" carries limited if indeed any applicability to the petitioning of foreign governments."); *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1366 (5th Cir.1983) ("We reject the notion that petitioning immunity extends only so far as the first amendment right and then ends abruptly. The Sherman Act, as interpreted by *Noerr*, simply does not penalize as an antitrust violation the petitioning of a government agency. We see no reasons why acts that are legal and protected if done in the United States should in a United States court become evidence of illegal conduct because performed abroad."); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (Although not specifically addressing the issue of whether *Noerr–Pennington* applied in the foreign context, the Court distinguished *Noerr* factually rather than holding the doctrine inapplicable to the foreign petitioning in dispute).

■ This Court agrees with the rationale articulated by the Fifth Circuit and implied by the U.S. Supreme Court: lobbying of foreign governments, whether performed at home or abroad, is protected from antitrust liability under *Noerr–Pennington*. To the extent that Defendants sought political action from Pakistani officials, their actions were not illegal simply because they were petitioning foreign, rather than domestic, government officers.

---

**10.** Moreover, despite Defendants' assertions to the contrary, they have produced no evidence tending to demonstrate that their communications to CEPC and PCMEA-requesting that CEPC not sponsor the November 1993 CGI show and that PCMEA not allow their participation in the 1994 Hand-knotted Carpet Exhibition-were at the very least indirect

attempts to challenge Pakistani policy or laws. *Cf. Federal Prescription Service, Inc. v. American Pharmaceutical Assoc.,* 471 F.Supp. 126, 130 (D.D.C.1979) (holding that a professional association's use of private group in publicity campaign was within the scope of *Noerr–Pennington* doctrine).

Finally, Plaintiffs maintain that even if certain of Defendants' conduct is protected under *Noerr–Pennington,* the Supreme Court's decision in *SCTLA* forecloses Defendants' reliance upon the doctrine. Specifically, Plaintiffs argue that Defendants "did not merely lobby the government to reject participation in CGI's trade shows. They engaged in a wide-ranging coercive boycott, one aspect of which was to force the government not to participate." (Pl.'s Opp. to Newman at 28.) The parties seem to agree that *SCTLA* provides clear parameters as to its limitation on *Noerr–Pennington.* For example, "conduct that seeks to influence government to act in a way that would restrain trade is protected, but conduct that in and of itself restrains trade, even if designed to obtain government action, is not protected." (Etessami Defs.' Reply at 10; *see also,* Plaintiff's Opp. to Newman at 30–31.)

Thus, the issue that remains is whether Defendants' "alleged restraint of trade was the intended *consequence* of public action, [or] . . . the *means* by which [Defendants] sought to obtain favorable legislation." *SCTLA,* 493 U.S. at 424–25, 110 S.Ct. 768 (emphasis in original). Plaintiffs argue that Defendants attempted to restrain CGI's trade shows and business plans and sought assistance from the Pakistani government in doing the same. Plaintiffs describe Defendants' interactions with Pakistani officials as follows:

- in 1992 ORIA President Etessami threatened "negative repercussions" if the government of India continued to support efforts that break the normal chain of distribution;

- in 1993 Etessami threatened that CEPC support of CGI would "jeopardize" the prosperous relationship between importers and manufacturers;

- in 1993 Hodges demanded that [the] CEPC provide him with the names of Indian manufacturers who were participating, so that he could boycott them;

- Hodges later reiterated his demand for names, implying that he was going to share them with other ORIA members at the August 30 general membership meeting;

- shortly before the 1993 Chicago trade show, a delegation of importers demanded that Pakistan "respect" the channels of distribution;

- in 1994, Newman announced he was boycotting a Pakistani exhibition as a means of compelling the PCMEA to pressure the EPB into not supporting the trade show;

- Newman wrote directly to the EPB and told them that he and ORIA opposed the trade show, and any assistance to [the show] would lead to "ill will and chaos;"

- threats directed at the PCMEA forced that private association to demand an end to EPB assistance to show participants. (Pls.' Opp. to Newman at 28–29.)

In reviewing the evidence, this Court must draw all reasonable inferences in favor of the non-moving party—Plaintiffs. This Court concludes that Defendants did not simply lobby Pakistani government to deny CGI support, but that they themselves engaged in efforts to undermine Plaintiffs' trade shows. Indeed, most of Plaintiffs' allegations are directly attributable to Defendants' behavior, rather than any government action. Even if Defendants' ultimate goal was to secure Pakistani government support of their position on the appropriate chain of distribution in the oriental rug industry, *SCTLA* teaches that the injuries resulting from such efforts may still be the basis for antitrust liability. 493 U.S. at 425, 110 S.Ct. 768. Defendants have failed to demonstrate that Plaintiffs' injury was caused solely or even primarily

by government action, particularly in light of this Court's finding that the CEPC and PCMEA are private entities. Thus, Plaintiffs' injury cannot be classified as "incidental to [Defendants'] valid effort[s] to influence governmental action." *Allied Tube*, 486 U.S. at 499, 108 S.Ct. 1931. To the contrary, any action secured on the part of the Pakistani government would have been *in addition to* Defendants' own attempts to undermine CGI's efforts.

■ This Court therefore determines that the restraint alleged by Plaintiffs is largely the result of private action directed at the government, rather than governmental action, and that consequently, most of Defendants' conduct is not subject to *Noerr–Pennington* protection. Nonetheless, to the extent that Defendants petitioned the EPB and Pakistani Minister of Commerce not to subsidize CGI's trade shows and other business efforts, their actions are protected by *Noerr–Pennington*. (*See* Green Decl., Ex. 6; Ira Asen Cert., Ex. C.) However, the remainder of Defendants' conduct-including their communications with the CEPC and PCMEA, is not immune, and thus may be the basis of antitrust liability.[11] (*See* Green Decl., Ex. 7; Ira Asen Cert., Ex. B.)

## II. The Remaining Evidence

Since Defendants' actions are not protected by the *Noerr–Pennington* doctrine, this Court must evaluate whether Plaintiffs have provided evidence sufficient to maintain their antitrust and related state law claims. Plaintiffs rely upon the following evidence: [12]

- In a letter dated September 24, 1992, Etessami, as president of ORIA, wrote to Pakistan's Minister of Commerce in response to the EPB's support of a Pakistani manufacturer's direct supply to a U.S. department store: "I cannot emphasize enough the damage that would be done to our cooperative efforts if the [EPB] were to make funds available to a department store for the promotion of one sale ... Our message is simple: work with the American importer in promoting your rugs and not around him." (Green Decl., Ex. 6.);

- In a letter to Beijing DDB Needham Advertising, dated September 25, 1992, ORIA, through its Executive Director, Lucille Laufer ("Laufer"), admitted that it strongly recommended to two trade publications that they "not accept ads from manufacturers, because their retail readership would contact manufacturers directly, cutting out the importer." (Fierst Decl., Ex. 5.) A year later, in a September 1, 1993 memorandum, Plaintiffs noted that Rug News-one of the trade publications mentioned in Laufer's letter-rejected advertising by CGI with the explanation that it did not accept ads

11. The Newman Defendants base their entire motion for summary judgment on a *Noerr–Pennington* defense. Because this Court decides that only Defendants' communications to the EPB and Pakistani Minister of Commerce are entitled to *Noerr–Pennington* immunity, the Newman Defendants' motion for summary judgment is denied. Moreover, because the Newman Defendants do not challenge the sufficiency of Plaintiffs' proof of their Sherman Act and tortious interference claims, this Court will not evaluate those claims with regard to the Newman Defendants.

12. Plaintiffs purport to authenticate all the evidence produced in support of Defendants' illegal activity. (David Fierst Decl. ¶ 2.) Nevertheless, Plaintiffs' evidence is summarized below without an evaluation of its reliability or admissibility with regard to this Court's evaluation of the instant motions. To the extent that Plaintiffs rely upon any such evidence to challenge Defendants' specific contentions, its admissibility-where contested-is addressed therein.

promoting foreign manufacturers, and asserting that CGI's trade fair would damage oriental rug importers. (*Id.*, Ex. 24.);

- The minutes from an ORIA meeting, dated December 7, 1992, state that Etessami met with Mr. Da from the Chinese Exports Association ("CEA"), and explained to him that he would not be able to deal directly with retailers, but that the CEA had to "go through our members." (*Id.*, Ex. 8 at 2.);

- On May 1, 1993, Plaintiffs received a letter from Roz Rustigian ("Rustigian"), President of the Oriental Rug Retailers Association ("ORRA"), requesting that Elsea make clear that his views and endeavors are not on behalf of, or sanctioned by, ORRA. (Fierst Decl., Ex. 68.) Notes from an ORIA meeting, dated May 24, 1993, suggest that Laufer, ORIA's Executive Director, contacted ORRA and urged the group to disassociate itself from Elsea. (*Id.*, Ex. 11.) In an undated memorandum to ORRA board members, Rustigian stated: "Over the past year ORRA has made significant progress in mending fences with its sister organization ORIA ... Last year a letter went out under my signature that effectively distanced ORRA from Carpet Group International ... The building process is slow ... and it will come to a grinding halt, in my opinion, if we even entertain the notion of joining forces with Carpet Group International. Both Dan Hodges and Gene Newman have gone on record requesting that ORRA continue to disassociate itself from Mr. Elsea's efforts ..." (*Id.*, Ex. 39.);

- On July 23, 1993, Etessami, as President of ORIA, threatened that CEPC's support of CGI would "possibly jeopardize a very friendly and prosperous relationship that American Importers and Indian Manufacturers have worked diligently on developing." [13] (Green Decl., Ex. 7.);

- On August 11, 1993, Hodges, as President of Pande Cameron and Company of New York, demanded that the CEPC provide him with the names of Indian manufacturers who were participating, so that he could boycott them: "Once again, I would also appreciate your sending to me the names of those exporters from India who plan on exhibiting [with CGI's November trade fair]. These would be exporters, I can assure you, we would avoid in any future business discussions." (Fierst Decl., Ex. 15);

- Hodges later reiterated his demand for names, implying that he was going to share them with other ORIA members at the August 30 general membership meeting (Fierst Decl., Ex. 17.) The CEPC eventually complied with Hodges request, sending a list of CEPC participants in the November 1993 trade fair (*Id.*, Ex. 20.);

- Minutes from ORIA's August 30, 1993 meeting state: CGI's November show "was discussed and it was decided not to deal with it since the show will not succeed. Of course there has been certain communication between ORIA and India's Carpet Promotion Bureau and ORRA." (Fierst Decl., Ex. 22.);

- In a September 15, 1993 memorandum, Plaintiffs note that the Zarnegian International Rug Co., which had registered to participate in CGI's November 1993 trade fair, informed Plaintiffs that it could no longer participate since Zarnegian's ORIA membership and benefits

**13.** Etessami contends that he did not draft or sign the July 23, 1993 letter, or the September 24, 1992 letter also noted above. For the purpose of the instant motion, however, Etessami does not challenge that he authorized both letters. (Etessami Mem. at 11 n. 1.)

would be in jeopardy if it did. (*Id.*, Ex. 28);

- Notes from a telephone conversation with Durusel of Durusel Carpet Co., dated September 27, 1993, suggest that Durusel stated that he had to cancel his booth with the trade fair because ORIA was opposing the show and he was told by ORIA that only one other Turkish Exhibitor would be attending and that the show would fail. Durusel also allegedly stated that he would like to show at the fair, but was afraid of what was going on. (*Id.*, Ex. 27.);

- Elsea's handwritten notes, dated September 27, 1993, indicate a conversation with "Ron O'Calahan" from Decorative Rug Magazine in which O'Callaghan stated that the magazine "is withdrawing acceptance of our ads-He stated that the ORIA & other importers including Bashian, NooNoo Rug Co., and Noury & Sons would quit advertising-He also stated that ORIA is actively opposing the show and has pressured his publication to run editorials against the show ..." (*Id.*, Ex. 25.);

- In notes from a December 7, 1993 ORIA board members' meeting, Newman read a memo that was to be distributed to all members regarding CGI's November 1993 fair which "cut out the role of the importer in the chain of distribution." (*Id.*, Ex. 31.) Lee Harounian "suggested to boycott the exhibitor/manufacturers of that show." Bashian "suggested to ignore the issue." Finally, "[i]t was later decided that the above memo should not go to all members but to the board members only." (*Id.*) A list of the exhibitors was purportedly attached to the "memo" regarding Carpet Group, though not produced by Defendants. (*Id.*, Ex. 32.);

- On January 18, 1994, Newman wrote to the PCMEA, stating that he would not attend the Pakistan Hand-knotted Carpet Exhibition, since he was unwilling "to participate in [or] attend seminars or exhibitions which have been arranged by some of the very individuals or groups who do not adhere to correct business practices." (Ira Asen Cert., Ex. B.);

- In March, 1994, Elsea began negotiations with the ORRA Board of Trustees to cosponsor CGI's 1994 trade show. (Fierst Decl., Ex. 36.) On March 23, both Newman (as President of NooNoo Rug Co.) and Hodges (as President of ORIA) sent separate letters to ORRA President Rustigian to discourage ORRA from "promoting, sponsoring, or sanctioning" the trade show. (*Id.*, Exs. 37 and 38, respectively.) Specifically, Hodges stated, "We would naturally hope that the ORRA would not entertain any thoughts whatsoever in being involved and therefore lending credence to Carpet Group International." (*Id.*, Ex. 38.);

- On March 21, 1994, Newman wrote (on NooNoo letterhead) to the Vice–Chairman of the EPB, "I am aware that another exporter to retailer rug exhibition is planned for August in Washington, D.C. My personal opposition to this type of activity, as well as that of the ORIA of which I am Executive Board member, is unequivocable [sic] ... I urge the PCMEA and EPB not to encourage nor support the 'renegade' activities and selfish motives of a few Pakistani trader/exporters and their American retail counterparts. To do so would be to continue on the road leading to ill will and chaos." (Ira Asen Cert., Ex. C.);

- On March 28, 1994, Hodges, as President of ORIA, sent a letter to Rustigian offering to assist any financial disadvantages to ORRA's disassociation from CGI: "If divorcing yourself form [sic] the CGI exacerbates whatever fiscal problems might exist within ORRA, I would be

more than happy to accompany Gene Newman in any discussions we might have toward helping you overcome these problems." (Fierst Decl., Ex. 40.) ORIA's attempts to prevent ORRA's sponsoring of CGI was also documented in ORIA's meetings minutes, dated March 31, 1994 and April 12, 1994. (*Id.*, Ex. 42, 44.) The minutes from the April 12, 1994 ORIA meeting states, for example: "Roz Rustigian the president of ORRA has been contacted by Dan and Gene and has promised not to endorse the show as a group. Gene urged the members who import from Pakistan, India and other countries to write the proper Export Promotion authorities in those countries and advise them not to participate in this show." (*Id.*, Ex. 44 at 2.) The minutes from the August 16, 1994 ORIA meeting reveal ORIA member Aram Jerrehian's request that the prior statement by Gene be amended from "Gene Newman urged the members who import ..." to "Gene Newman suggested that the individual members and not the organization ..." (*Id.*, Ex. 52.);

- In a June 1, 1994 letter to ORIA, PCMEA Vice–Chairman Imran Malik states, "As a first step towards rebuilding the old relationship, the Association has decided not to officially participate in the Washington Fair being held in August this year, and have also requested the Export Promotion Bureau, Government of Pakistan *not* to give any facility to the intending participants ... [N]o manner of encouragement or patronage will be provided by the Association to any firm desiring to participate in its personal capacity." (*Id.*, Ex. 50) (emphasis in original);

- On April 25, 1994, Floor Covering Weekly published a news article about CGI's

August 1994 trade show. (*Id.*, Ex. 45.) The next day, Newman sent a fax to Floor Covering Weekly, lamenting, "I cannot understand why you would publicize an exhibition whose main purpose is to exclude the importer/wholesaler (your advertiser base) in favor of direct trade between foreign exporters and American retailers." (*Id.*) At ORIA's May 10, 1994 meeting, Laufer "suggested writing [Floor Covering Weekly] a letter to investigate all Press Releases before publishing them." (*Id.*, Ex. 47 at 3.) On June 20, 1994, notes recorded on CGI paper state: "I spoke with Gail Cortelyou at Floor Covering Weekly at 1:00 pm today-She told me FCW has been getting pressure from the 'Importer' not to do favorable stories on [CGI's trade fairs]." (*Id.*, Ex. 48.);

- On May 25, 1994, Bill Hirsch, owner of W. Hirsch, Inc. Oriental Rugs, made the following notes from a call with Joel of Kelaty International: "the whole market knows about me & Elsea's group[,] we will not be able to get rugs from anyone ... We are being dealt with from both ends[,] i.e., can not get supplied in U.S., also those who supply us from overseas will be boycotted by importers ..."[14] (*Id.*, Ex. 49.);

- Istanbul Grand Bazaar ("IGB"), an importer of Turkish rugs, and member of ORIA, participated in the 1993 CGI show. (Elsea Supp. Decl. ¶ 3.) Huseyin Aktug, President of IGB, informed Elsea that IGB would not be able to take part in CGI's 1994 trade show since he could not be the only member of ORIA to participate. (*Id.*, ¶ 4.);

- Another intended participant of the 1994 trade show, Anadol Rugs, also cancelled its contract allegedly at the behest of

---

14. Hirsch authenticates his notes of the conversation with Joel of Kelaty International, in his Declaration, dated September 3, 1997. (Fierst Decl., Ex. 72.)

ORIA. Despite having sent a deposit for a booth in the 1994 trade show (Fierst Decl., Exs. 55, 56), Anadol cancelled its contract, stating: "We have received today a fax from [ORIA] regarding the exhibit you are arranging in Washington, DC. As Anadol Rug Co. we have no intentions whatsoever to attend this exhibit. Please rectify this situation immediately, writing to [ORIA] that it was a mistake on your part." (*Id.*, Ex. 58.);

- On April 11, 1995, Hodges, as President of ORIA, wrote to Carpet–E–World in response to an editorial published by the trade publication in support of allowing manufacturers in the ORIA Atlanta Rug Fair. Hodges reiterated that "[t]here is an established chain of distribution (from manufacturer/exporter to wholesaler/importer to retailer)," and warned, "Our Association will obviously take every measure possible to insure the continuation of a long established and successful form of distribution." (*Id.*, Ex. 60.)

## III. Section 1 of the Sherman Act

 Section 1 of the Sherman Antitrust Act states, in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal .... 15 U.S.C. § 1 (1997).

To establish a Section 1 violation, Plaintiffs must prove: (1) concerted action by Defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that Plaintiff was injured as a proximate result of the concerted action. *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1229 (3d Cir.1993). "With-out proof of all of these elements," Plaintiffs' claim must fail. *Id.*

Although the "traditional summary judgment standard applies with equal force in antitrust cases," the meaning attributed to circumstantial evidence will vary depending upon the challenged conduct. *Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 1001 (3d Cir.1994) (citing *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). For instance, "evidence of conduct which is 'as consistent with permissible competition as with illegal conspiracy,' without more, does not support an inference of conspiracy." *Id.* at 1001 (quoting *Matsushita,* 475 U.S. at 597 n. 21, 106 S.Ct. 1348). In comparison, where the "alleged conduct is 'facially anticompetitive and exactly the harm the antitrust laws aim to prevent,' no special care need be taken in assigning inferences to circumstantial evidence." *Id.* (quoting *Eastman Kodak,* 504 U.S. at 478, 112 S.Ct. 2072.) Accordingly, where an antitrust plaintiff has only proffered ambiguous evidence, "the Supreme Court has required [that plaintiff submit] 'evidence tending to exclude the possibility' of independent action, i.e., 'direct or circumstantial evidence that reasonably tends to prove that the alleged conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.* (quoting *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)).

 As suggested above, "a non-movant Plaintiff in a section 1 case does not have to submit direct evidence, i.e., the so-called smoking gun, but can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence." *Petruzzi's,* 998 F.2d at 1230. In determining whether certain behavior amounts to a prohibited restraint, this

Court must apply one of two methods of analysis. Depending on "the essence of the concerted action in dispute," Defendants' actions will be analyzed under either the "per se" or the "rule of reason" method. *In re Baby Food Antitrust Litigation,* 166 F.3d 112, 117–118 (3d Cir.1999). The "rule of reason" analysis requires "a case-by-case method that involves consideration of all of the circumstances of a case to decide whether certain concerted action should be prohibited because it amounts to an anticompetitive practice." *Id.* at 118.

In comparison, the "per se" standard "presumes that the questionable conduct has anticompetitive effects without comprehensive inquiry into whether the concerted action produced adverse, anti-competitive effects." *Id.* "Per se" violations "include those types of restraints on competition that are in and of themselves considered unreasonable because their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Id.*

In this case, the Third Circuit has already determined that the "per se" analysis is the appropriate method of review. *Carpet Group,* 227 F.3d at 74 (Although "the Supreme Court ... has curtailed the application of *per se* analysis in cases alleging concerted refusals to deal in recent years[,] ... the plaintiffs['] claims appear to fail within that class of cases that still enjoys *per se* analysis.").

### A. Concerted Action

In *Alvord–Polk,* the Third Circuit noted: "The very essence of a section 1 claim ... is the existence of an agreement. Indeed, section 1 liability is predicated upon some form of concerted action." 37 F.3d at 999. Both Bashian Bros. and the Etessami Defendants contend that Plaintiffs have failed to establish that they engaged in concerted activity. First, Defendants argue that their mere membership in ORIA cannot give rise to an inference of conspiracy. *James Julian, Inc. v. Raytheon Co.,* 557 F.Supp. 1058, 1064–65 (D.Del.1983). Rather, "proof of knowing, intentional participation in illegal activities of members of the trade association will support a Sherman Act cause of action." *Id.* at 1065 (citing *Zenith Radio Corp. v. Matsushita Elec. Industrial Co.,* 513 F.Supp. 1100, 1149 (E.D.Pa.1981), *rev'd on other grounds,* 723 F.2d 238 (3d Cir.1983), *rev'd* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Thus, "mere membership, even when coupled with knowledge of wrongful conduct of the association, is insufficient to establish knowing participation." *Id.* (citing *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 231 (S.D.N.Y. 1978), *aff'd,* 610 F.2d 806 (2d Cir.1979)). Nonetheless, it is important to note that the standard of knowing participation is not onerous. In fact, "[k]nowing participation may occur when members tacitly or expressly ratify the known illegal actions of the association or individual members." *Id.*

### 1. Bashian Bros.

Bashian Bros. thus first disputes the existence of any evidence demonstrating that Bashian Bros. knowingly participated in a conspiracy with other ORIA members.[15] Bashian Bros. emphasizes that although it was a member of ORIA, and attended ORIA meetings through its president George Bashian, Jr. ("Bashian"), "[o]pportunities to conspire are not probative of whether firms did in fact conspire;

---

15. For purposes of the instant motions, Bashian Bros. does not dispute the existence of a conspiracy among ORIA members, but wheth-er Plaintiffs can demonstrate that Bashian Bros. actively participated in such a conspiracy. (Bashian Bros. Br. at 4.)

an opportunity to conspire will always exist." *Brown v. Cameron–Brown Co.,* 1980–2 Trade Cases ¶ 63,400 at p. 76040, 1980 WL 1856 (E.D.Va.1980).

To their detriment, Plaintiffs rely on the Second Circuit's decision in *Phelps Dodge Refining Corp. v. FTC,* 139 F.2d 393, 396–97 (2d Cir.1943), for the proposition that membership alone coupled with knowledge of illegal activity is sufficient to impose civil liability. (Pls.' Supp. Mem. in Opp. to Bashian Bros. at 3.) Neither the Third Circuit nor any federal district court in the District of New Jersey has published an opinion directly on this issue. Other courts, however, have noted that *Phelps'* "membership-ratification theory ... has not retained the force of law." *Wilk v. American Medical Assoc.,* 671 F.Supp. 1465, 1492 (N.D.Ill.1987). As noted by the court in *Wilk,* numerous courts have since required actual knowledge of, and participation in, an illegal scheme in order to find concerted action by members of associations. *Id.* (citing *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226, 231–33 (9th Cir.1974); *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 231 (S.D.N.Y.1978), *aff'd,* 610 F.2d 806 (2d Cir.1979); and *James Julian,* 557 F.Supp. at 1058.). This Court finds the reasoning of these latter cases more persuasive. Accordingly, in order to avoid summary judgment, Plaintiffs must produce evidence raising a genuine dispute as to Bashian Bros.' active participation in the alleged ORIA conspiracy.

In support of Bashian's participation in the ORIA conspiracy, Plaintiffs submit various correspondence and Bashian's deposition testimony. (*See* Pls.' Opp. to Bashian Bros. at 29–33; Pls.' Supp. Opp. to Bashian Bros. at 5–12.) The vast majority of Plaintiffs' evidence relies upon Bashian Bros.' membership in ORIA and Bashian's presence at meetings where CGI activities were discussed. Such evidence, as noted above, is not sufficient to establish Bashian Bros.' liability and thus will not be discussed here. The most persuasive factual allegations regarding Bashian Bros.' participation in the conspiracy can be summarized as follows: [16]

- Testimony from Hodges that Bashian was shown drafts of "provocative" letters for his approval (Fierst Decl., Ex. 14 at 200–01.);

- Bashian's testimony that he knew about Newman's refusal to attend the Pakistan Hand-knotted Carpet Exhibition (*Id.,* Ex. 12 at 128–29.);

- A letter from Newman to PCMEA, dated July 1, 1992, in which Newman specifically alludes to Bashian (Ira Asen Cert., Ex. H.); and

- Elsea's notes from a conversation with Ronald O'Callaghan, publisher of Decorative Rug Magazine, in which O'Callaghan mentioned Bashian Bros.' threats to quit advertising if the magazine accepted Plaintiffs' advertisements. (*Id.,* Ex. 25.)

Unfortunately, such evidence does not raise a genuine issue as to Bashian Bros.' participation in the ORIA conspiracy. Certainly, Plaintiffs could make out their case entirely upon circumstantial evidence, and the reasonable inferences drawn from such evidence. *Alvord–Polk,* 37 F.3d at 1000. However, Bashian Bros. correctly points out that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Ra-*

---

**16.** Of course, to the extent that Plaintiffs rely upon Bashian's participation in a meeting with Pakistani public officials, such communications are protected by the *Noerr–Pennington* doctrine, and thus may not serve as the basis for antitrust liability. (*See* Pls.' Supp. Opp. at 9–11 and *supra* note 6.)

*dio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That is, Plaintiffs must "do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Alvord–Polk*, 37 F.3d at 1001 (quoting *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348). Plaintiffs have failed to meet this burden.

▮▮ Plaintiffs admit that the alleged conspiracy "was carried out largely through the sending of threatening letters to exporters, associations, publications, government officials and others." (Pls.' Supp. Mem. in Opp. to Bashian Bros. at 11.) Yet Plaintiffs have failed to produce evidence tending to demonstrate that Bashian Bros. prepared, contributed to, or authorized any of the "provocative" correspondence supporting an ORIA conspiracy. For instance, Hodges' testimony that Bashian was shown drafts of "provocative" letters is rather speculative. Plaintiffs provide the following excerpt of Hodges' testimony: [17]

A. . . . There are some letters I will send to the association for Lucille [Laufer] to bounce off whoever [sic] she deems most appropriate for their adjudication, not her. I imagine she might well have shown this to George Bashian.

Q. Why would she show it to him?

A. He is a well-respected man.

Q. Why this letter as opposed to any other letter?

A. Again, there is no rhyme or reason to this.

. . .

Q. Why is it that you think this particular letter is one that she might have shown to George Bashian?

A. I'm just suggesting that George Bashian-perhaps I said something incorrectly or you misinterpreted what I said. George Bashian is one of the people to whom certain letters might be bounced off because he used to be a lawyer. He is very well respected.

. . .

Q. When you say certain letters might be bounced off him, can you be more specific as to what type of letters might be bounced off him?

A. Letters that, in my judgment, at any particular moment in time might be considered provocative, but again, there is not a standard there.

Q. Is this letter, the letter to Mr. Nath we've been talking about, is that one that you would consider to be provocative?

A. Not necessarily. (Fierst Decl., Ex. 14 at 200–01.)

Bashian, himself, denies ever seeing or approving such letters during Hodges' and Etessami's tenures as president of ORIA. (George Bashian Cert. ¶ 2.) Bashian's denial is corroborated by Laufer, who stated that she did not recall showing letters written by Hodges or Etessami to Bashian for his input or approval. (Lucille Laufer Cert. ¶ 2.) Hodges' admitted speculations, in the context of this conflicting testimony, do not raise a genuine issue as to whether Bashian did in fact review such letters.

Bashian's testimony as to his knowledge of Newman's refusal to attend the Pakistan Hand-knotted Carpet Exhibition is similarly unpersuasive. Indeed, Bashian testified that, "I have a vague recollection

17. Plaintiffs do not include, in their excerpt, the initial question posed to Bashian. (Fierst Decl., Ex. 14 at 200.)

of hearing people in the market, I don't remember who, saying that Gene Newman was not going to attend this exhibit." (Fierst Decl., Ex. 12 at 129.) When pressed further, Bashian denies any memory of hearing Newman's reasons for not attending the exhibit as well as with whom he discussed this information: "Like I say, it is a small industry, and somebody said Gene is not going to that trade show. Again, it was a matter of absolutely no importance to me." (*Id.* at 129.) Plaintiffs offer no evidence to dispute Bashian's testimony.

Plaintiffs' attempt to draw an inference of Bashian's participation in the ORIA conspiracy from Newman's July, 1, 1992 letter is also far-reaching. It is important to note that the letter relates Newman's concern with the "flagrant copying of [carpet] designs" rather than Plaintiffs' attempts to bypass the wholesaler/importer in the sale of oriental rugs. (Ira Asen Cert., Ex. H.) Thus, Newman's statement that "I and my fellow importers such as Mansour Rahmanan and George Bashian, Jr. say to you: It is time to put our house in order," bears little if any relevance to the conspiracy alleged against Plaintiffs. (*Id.*) Plaintiffs do not suggest that they were targeted for copying carpet designs. Accordingly, their reliance on this evidence is without merit.

 Plaintiffs' final piece of evidence, notes from Elsea's conversation with Ron O'Callaghan ("O'Callaghan") from Decorative Rug Magazine, would be their most persuasive were it admissible. Bashian Bros. argues that Elsea's handwritten notes documenting a conversation with O'Callaghan are hearsay. This Court agrees. This Court may not properly consider hearsay in evaluating the merit of Defendants' summary judgment motions.[18]

Elsea's recounting that O'Callaghan told him that "ORIA & other importers including Bashian . . . would quit advertising" if the magazine accepted CGI's ads does not fall within any exception to the hearsay rule. *See* FED. R. EVID. 803. Moreover, Elsea's notes are expressly contradicted by O'Callaghan's testimony that "[n]o one from Bashian Bros. or ORIA . . . ever contacted me and threatened to quit advertising in The Decorative Rug Magazine if we accepted advertisements from Mr. Elsea for his Chicago trade show." (Ronald O'Callaghan Cert. ¶ 2.)

Contrary to Plaintiffs' allegations, the evidence further suggests that Bashian attempted to disassociate himself from a boycott targeted at exhibitors who participated in CGI's 1993 trade show. Specifically, Bashian's response to Harounian's call for such a boycott at a December 7, 1993 ORIA meeting was recorded as: "Bashian suggested to ignore the issue." (Fierst Decl., Ex. 31.) Bashian Bros. points to the testimony of Laufer, which corroborates Bashian's rejection of Harounian's suggestion. (Howard Nashel Cert., Ex. F. at 74–75.) Plaintiffs, in response, contend that even if Bashian objected to a retaliatory boycott, "he did not object to the other concerted conduct directed at preserving the importers' position in the chain of distribution." (Pls.' Opp. to Bashian Bros. at 13.) Specifically, Plaintiffs argue that Bashian seemed more incensed by the term "boycott" than the desire to enforce the chain of distribution. To be sure, Bashian states that he became "livid at [Harounian's] use of the word 'boycott'." (Nashel Cert., Ex. E at 106.) Nonetheless, Plaintiffs' suggestion that Bashian quibbled only with the actual language used by Harounian, rather than the behav-

---

**18.** *See, e.g.,* FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence . . ."); FED. R. EVID. 802 ("Hearsay is not admissible except as provided by these rules . . .").

ior defining the term, is unsupported supposition, and thus inadequate to raise a genuine dispute as to Bashian's actions at the December ORIA meeting.

Based on the above, this Court concludes that Plaintiffs have failed to raise a genuine dispute as to Bashian's participation in the ORIA conspiracy to undermine CGI's trade shows. Accordingly, Bashian Bros.' motion for summary judgment as to Plaintiffs' Section 1 claims is granted.[19]

### 2. Etessami Defendants

Like Bashian Bros., the Etessami Defendants also argue that Plaintiffs have failed to demonstrate that either Isaac Etessami or Etessami & Sons has engaged in concerted activity in furtherance of the ORIA conspiracy.[20] Despite Plaintiffs' contention that Etessami's participation, as president of ORIA, is self-evident, Plaintiffs must point to evidence which would allow a rational trier of fact to find in their favor.[21] *See Alvord–Polk*, 37 F.3d at 1001;

see also, *James Julian*, 557 F.Supp. at 1065 n. 18 ("[M]ere membership, even when coupled with knowledge of wrongful conduct of the association is insufficient to establish knowing participation; [however,] once attendance is coupled with a later consistent act, an inference of knowing participation is permissible." (citing *Hunt*, 465 F.Supp. at 231)).[22] Disregarding evidence which implicates the Etessami Defendants solely on their membership in ORIA or attendance at ORIA meetings, as well as those communications protected by the *Noerr–Pennington* doctrine, Plaintiffs' evidence can be summarized as follows:

- Etessami's participation in CGI-related discussions at various ORIA Executive Board meetings (*See id.*, Exs. 10, 11, 19, 21,22.);

- Minutes from a December 1992 ORIA Executive Board meeting, in which Etessami reported that he met with Mr. Da from the Chinese Exports Association (Fierst Decl., Ex. 8.); and

**19.** Because this Court finds that there is no genuine dispute as to Bashian's active participation in the ORIA conspiracy, it does not reach the question of whether Bashian's actions can be imputed to Bashian Bros. *See Cape Cod Food Products v. National Cranberry Ass'n*, 119 F.Supp. 900 (D.Mass.1954) ("[T]he mere fact that an individual is an officer of a corporation does not make the corporation liable unless the individual was acting for or on behalf of the corporation at the time of the acting.").

**20.** Of course, Plaintiffs do not contend that Issac Etessami conspired with Etessami & Sons, as such a contention is not legally viable. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) ("[I]t is perfectly plain that an internal "agreement" [among officers or employees of the same company] to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.").

**21.** Plaintiffs argue that the Third Circuit has already found the existence of a conspiracy in

this case, and that "[o]nce a conspiracy is proved, the quantum of evidence necessary to prove membership in the conspiracy is lessened." (Pls.' Mem. in Opp. to Etessami Defs. at 4.) However, Plaintiffs have misread the Third Circuit's opinion. To the contrary, the Third Circuit noted that the anticompetitive effects of the conspiracy would be obvious "[i]f the plaintiffs can prove at trial that the alleged conspiracy actually exists." *Carpet Group*, 227 F.3d at 74. Thus, the Third Circuit did not find, as part of its decision, that a conspiracy actually existed.

**22.** This Court does not distinguish "mere membership" from officer/managerial positions in determining the proper standard for evaluating whether Etessami engaged in concerted activity. To be sure, Plaintiffs have not provided any evidence to suggest that rather than simply managing ORIA meetings, Etessami's role as President of ORIA, without more, evinces his active participation in any ORIA conspiracy.

- July 23, 1993 letter from Etessami to the Secretary of the CEPC (Green Decl., Ex. 7.).

This Court must therefore determine whether the above evidence implies the Etessami Defendants' "conscious commitment to a common scheme." *James Julian,* 557 F.Supp. at 1065.

### a. Issac Etessami

█ Plaintiffs first highlight Etessami's role as a "discussion leader" at various ORIA meetings on the topic of CGI, and argue that such action implies that Etessami was knowledgeable about ORIA's conspiracy to undermine CGI's trade shows and other activities. Yet, at those meetings where the minutes do not reflect a discussion of ORIA's animus or illegal scheme against Plaintiffs, the mere fact that Etessami attended and even spoke at a meeting does not permit an inference of conspiracy. *See Hunt,* 465 F.Supp. at 231 ("[T]he fact that [defendants] attended meetings at which the subject of the conspiracy was discussed would not by itself establish intentional membership in the conspiracy.").

Alone, the above information would not suffice to imply Etessami's active participation in the ORIA conspiracy. However, Plaintiffs also point to the minutes from a December 1992 ORIA meeting:

> Issac [Etessami] mentioned a meeting that he had with Mr. Da from the Chinese Exports Association. They are trying to deal directly with retailers by trying to attend Atlanta and by advertising in our trade publication. Issac explained to them that this would be impossible, Issac told them that they had to go through our members not directly to the retailers. (Fierst Decl., Ex. 8 at 2.)

Plaintiffs argue that a jury could infer from this statement that Etessami was part of the effort to force manufacturers to sell to the importers, and not directly to retailers. (Pls.' Opp. to Etessami Defs. at 7.) In response, the Etessami Defendants contend that these minutes simply reflect Etessami's, and ORIA's, decision to not allow its own resources-i.e., the ORIA trade show in Atlanta and ORIA's trade magazine-to take business away from its members. Such action, the Etessami Defendants insist, is a proper exercise of practical business sense rather than illustrative of an antitrust violation. Defendants' interpretation of the minutes, although plausible, simply raises a dispute as to the exact meaning of the passage. Drawing all inferences in favor of Plaintiffs, this Court is constrained to hold, in the context of all the evidence, that Etessami's statements hold no persuasive weight.

Plaintiffs also point to a July 23, 1993 letter from Etessami in his capacity as president of ORIA to the CEPC, urging the organization not to sponsor CGI's November 1993 trade show. (Green Decl., Ex. 7.) Specifically, Etessami admonishes, "By co-sponsoring the show you will be breaking the normal mode of distribution (by entirely cutting out the Importer) and possibly jeopardize a very friendly and prosperous relationship that American Importers and Indian Manufacturers have worked diligently on developing." (*Id.*) Plaintiffs suggest that these letters are direct evidence of Etessami's participation in the boycott. The Etessami Defendants respond that the letter is protected by the *Noerr–Pennington* doctrine. Since this Court has already determined that the doctrine will not protect Defendants' communications to non-governmental agencies, such as the CEPC, this argument is without merit.

The Etessami Defendants also argue that Plaintiffs cannot show more than a

few "scattered incidents" of independent action, which does not amount to concerted action. Defendants point to the minutes of an ORIA meeting on August 30, 1993, which state that "[t]he carpet show sponsored by Carpet Group International in Chicago in November 1993 was discussed and it was decided not to deal with it since the show will not succeed." (Fierst Decl., Ex. 22.) Defendants further argue that the minutes from a December 7, 1993 meeting show a lack of consensus concerning how to respond to CGI's trade shows. (*Id.*, Ex. 31.)

■ Of course, the very ORIA minutes cited by Plaintiffs contain conflicting dialogue. For example, although the August 30, 1993 minutes state that "it was decided not to deal with [CGI's trade fair]," they continue, "Of course, there has been certain communication between ORIA and India's Carpet Promotion Bureau and ORRA." (Fierst Decl., Ex. 22.) Combined with the other evidence presented by Plaintiffs, the August 30, 1993 minutes do not compel this Court to find an absence of concerted action. If anything, such evidence simply raises a genuine dispute as to whether the ORIA members at that meeting agreed to undermine Plaintiffs' efforts. For Etessami to be held liable for section 1 conspiracy, Plaintiffs need not prove that *every* member of ORIA agreed to thwart its business attempts, but only that other

Defendants acted in concert with Etessami to further illegal activity.[23]

■ Moreover, Defendants' assumption that Plaintiffs must present evidence tending to exclude the possibility of independent action is improper. To the contrary, because the conduct alleged by Plaintiffs is "facially anticompetitive ..., no special care need be taken in assigning inferences to circumstantial evidence."[24] *Alvord–Polk*, 37 F.3d at 1001 (citing *Tunis Brothers Co., Inc. v. Ford Motor Co.*, 823 F.2d 49, 50 (3d Cir.1987) for the proposition that "*Matsushita* requires evidence tending to exclude the possibility of independent action only when the challenged conduct is as consistent with permissible competition as with illegal conspiracy.").

This Court determines, based on the above evidence, that Plaintiffs have raised a genuine issue as to whether Etessami knowingly participated in the ORIA conspiracy. Relying on the inferences from Plaintiffs' evidence, a jury could reasonably determine that Etessami had knowledge of ORIA's attempts to undermine CGI's trade fairs from his meetings with other individuals on the subject, and acted on this knowledge in writing the letter to CEPC discouraging that organization's sponsorship of CGI. *See James Julian,* 557 F.Supp. at 1065 n. 18. The issue of Etes-

23. Of course, the Third Circuit has held that an association, such as ORIA, "can only be held liable for concerted action if it acted as an entity," although evidence of an "official board resolution, or other officially sanctioned activity" is not required. *Alvord–Polk*, 37 F.3d at 1007–08 n. 9. This rule does not, however, apply to a determination of the Etessami Defendants' liability.

24. Indeed, the Third Circuit, reviewing the same evidence, remarked:

The defendants' conduct complained of ... can be characterized as having a pernicious effect on competition and lacks any redeeming virtue ....[I]t appears that the refusal to deal here at issue is predominantly anticompetitive. If the plaintiffs can prove at trial that the alleged conspiracy actually exists, the anticompetitive effect of such a conspiracy would be immediately obvious. There appears to be no reason for the defendants' action other than to protect the wholesaler/importer's role in the chain of distribution. *Carpet Group,* 227 F.3d at 74 (citations omitted).

sami's concerted action may therefore proceed to trial.[25]

### b. Etessami & Sons

 Defendants contend that even if this Court were to find evidence tending to demonstrate Etessami's active participation in the ORIA conspiracy, Etessami's actions may not be imputed to Etessami & Sons. Plaintiffs acknowledge that their sole basis for seeking to impose liability on Etessami & Sons is that "Etessami & Sons clearly had knowledge of the conspiracy through the active participation of its Secretary Isaac Etessami." (Pls.' Opp. to Etessami Defendants at 21; Etessami Defs.' Reply Mem. at 14.)

In *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir.1994), the Third Circuit evaluated whether an association could be "charged with acting through agents with whom it ha[d] imbued with apparent authority" in an antitrust dispute.[26] *Id.* at 1009. As part of its analysis, the Third Circuit relied upon general agency principles, noting that "a principal will be liable for an antitrust violation if an agent acting with apparent authority violates the antitrust laws." *Id.* The Court's reasoning was based in part on the Restatement (Second) of Agency §§ 215 *et seq.*, which state that a principal is liable for the "torts of its servants" and for its "servants' tortious conduct." *See id.*

Under the Restatement, a "master is liable for the torts of his servants committed while acting in the scope of their employment." RESTATEMENT (SECOND) OF AGENCY § 219 (1958). A master is not liable for the torts of servants committed outside of the scope of their employment unless, *inter alia,* "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority ..." *Id.; see also* § 265 ("A master or other principal is subject to liability for torts which result from reliance upon, or belief in, statements or other conduct within an agent's apparent authority."). Thus, the crucial issue is whether Etessami's actions were within the scope of his employment as secretary/treasurer of Etessami & Sons.

The Etessami Defendants first note that Etessami was never the president or key decision-maker of Etessami & Sons. Rather, Defendants argue that Etessami held the "relatively minor position of secretary/treasurer in a family company where all business decisions were made by Moussa Etessami, Etessami's father." (Etessami Decl. ¶ 3.) Moreover, Defendants maintain that Etessami "rarely discussed ORIA meetings with [his] father, who [could] not read English, and ... does not know what was discussed or what took place at the meetings." (*Id.* ¶ 6.) For these reasons, Defendants contend that Etessami was not an agent of Etessami & Sons such that his actions may be attributed to that organiza-

---

**25.** The Etessami Defendants do not challenge the sufficiency of Plaintiffs' proof as to the remaining elements of a section 1 claim, such as "anticompetitive effects within the relevant product and geographic markets." See *Petruzzi's*, 998 F.2d at 1229. Regardless, under the "per se" standard-which the Third Circuit has directed this Court to apply-activity may "engender liability without inquiry into the harm it has actually caused." *Alvord–Polk*, 37 F.3d at 1000.

**26.** Defendants emphasize the Third Circuit's conclusion that "in the absence of a co-conspirator, an association's actions satisfy the concerted action requirement only when taken in a group capacity." 37 F.3d at 1009. Of course, ORIA's liability for the alleged actions of its members is not currently an issue before this Court. *See* note 1, *supra.* Moreover, Plaintiffs do not allege that Etessami, by himself, conspired with ORIA, but rather that Etessami, along with other ORIA members, conspired to undermine Plaintiffs' activities.

tion. The Etessami Defendants further argue that since ORIA's officers were selected as individuals, and not representatives of their individual companies, any action taken by ORIA officers was taken solely on behalf of ORIA and not on behalf of Etessami & Sons.

According to the Restatement, "[a] servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." RESTATEMENT (SECOND) OF AGENCY § 220 (suggesting factors to be considered in determining whether one acting for another is a servant). In addition,

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits; [and]
>
> (c) it is actuated, at least in part, by a purpose to serve the master ... *Id.* § 228.

Plaintiffs argue that the terms of ORIA's by-laws suggest that Etessami's actions as an ORIA member were in the scope of his employment as an officer of Etessami & Sons. In particular, Plaintiffs highlight ORIA's self-described purpose "[t]o promote the best interests of the Oriental Rug Industry ... and foster and publish standards of business practice for Association members." (Fierst Decl., Ex. 64.) Moreover, although ORIA membership is non-transferable, even to business partners/co-workers of existing members (Etessami Decl. ¶ 9), it is clear that membership is open only to "individuals or companies engaged in the wholesale importation or the wholesale merchandising and distribution of Oriental Rugs ..." (Fierst Decl., Ex. 64.)

Similarly, despite Etessami's contention that as a secretary/treasurer of Etessami & Sons, he was not a principal officer, ORIA's by-laws indicate that its membership was limited to principals of member companies: "A proposed member shall have conducted business in the United States as a wholesaler/importer of Oriental rugs in the capacity of principal for a period of not less than three years prior to application ..." (*Id.*) Indeed, absent Etessami's status as a representative of Etessami & Sons, it is clear that Etessami would not have had an interest in, nor been eligible to, participate in ORIA activities. Although Etessami avers that his father, Moussa Etessami, made all decisions as to the family business (Etessami Decl., ¶ 3), he does not dispute that his participation in ORIA was actuated at least in part by a desire to serve his employer. It also makes sense that Etessami's father, as a non-English speaker, would pass the duty to represent the family company in an American trade association on to his son.

Applying general agency principles, Etessami was clearly acting in service of Etessami & Sons by attending ORIA meetings, taking on various leadership roles within the organization, and participating in the creation and execution of the organization's agenda. This Court therefore finds that Etessami's actions as a member and president of ORIA were "so closely connected with what a servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods ... of carrying out the objectives of [his] employment" with Etessami & Sons. *DiCosala v. Kay,* 91 N.J. 159, 450 A.2d 508, 513 (1982) (applying the RESTATEMENT (SECOND) OF AGENCY § 228 (1957)). Accordingly, Etessami & Sons may be held liable for the actions of Etessami, and the Etessami Defendants'

motion for summary judgment as to Plaintiffs' section 1 claim is denied.[27]

## IV. Section 2 of the Sherman Act

As noted by the Third Circuit, "[w]hen a boycott's aim is to monopolize trade, it might also violate section 2." *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154, 157 (3d Cir.1999). Section 2 of the Sherman Act states, in relevant part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ... 15 U.S.C. § 2 (1997).

### A. Elements of each Section 2 claim

### 1. Monopolization

In order to survive Defendants' motions for summary judgment as to their section 2 monopolization claim, Plaintiffs must demonstrate that: (1) defendants "possessed monopoly power in the relevant market"[28] and (2) defendants "willfully acquired and maintained monopoly power and did not acquire its monopoly share due to 'growth or development as a consequence of a superior product, business acumen, or historical accident.'" *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 749 (3d Cir.1996) (quoting *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 808 (3d Cir.1984)). Plaintiffs bear the burden of "establishing the relevant market for purposes of prov-

ing its actual monopoly claim," as well as defendants' control over a monopoly share of such market. *Id.*

### 2. Attempted Monopolization

In order to maintain their attempted monopolization claim, Plaintiffs must prove three essential elements: (1) that Defendants "engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Ideal Dairy Farms*, 90 F.3d at 750 (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454–58, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)). "Whether a party violates § 2 of the Sherman Act by attempting to monopolize is a question of proximity and degree." *Id.* (citations omitted).

In order to state a claim for a section 2 violation, Plaintiffs must also allege that Defendants possessed sufficient monopoly power or, in the alternative, sufficient market power to come dangerously close to successful monopolization. Monopoly power is defined as "the power to control prices or to exclude competition." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 111–12 (3d Cir.1992). "[A]lthough the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive." *Id.* at 112. "Other factors to be considered include the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive

---

27. Because this Court has determined that Etessami's actions as a member of ORIA were performed within the scope of his employment, it does not consider whether Etessami's actions were conducted, in the alternative, with the apparent authority of Etessami &

Sons. *See* RESTATEMENT (SECOND) OF AGENCY § 219.

28. In the instant case, Plaintiffs define the relevant product market as "the importing and wholesale distribution of Oriental rugs." (Second Amended Compl. ¶ 15.)

conduct, and the elasticity of consumer demand." *Id.; see also Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir.1998).

### 3. Conspiracy to Monopolize

■ "Unlike the proof required for monopolization or attempted monopolization, the proof required to demonstrate a conspiracy to monopolize does not require a proof of market power in a relevant market." *Appraisers Coalition v. Appraisal Institute*, 845 F.Supp. 592, 603 (N.D.Ill. 1994). Rather, Plaintiffs may show a conspiracy to monopolize by demonstrating that there was "(1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize the relevant market, (3) the commission of an overt act in furtherance of the alleged conspiracy, and (4) that there was a dangerous probability of success." *Urdinaran v. Aarons*, 115 F.Supp.2d 484, 491 (D.N.J.2000) (citing *Farr v. Healtheast, Inc.*, 1993 WL 220680, *11 (E.D.Pa.1993)). Defendants' specific intent to monopolize the importing and wholesale distribution of oriental rugs may be inferred from proof of actual monopoly power. *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 154 (3d Cir.1981).

### B. Bashian Bros.

With regard to Plaintiffs' monopolization and attempted monopolization claims, Bashian Bros. argues that Plaintiffs have failed to state a claim upon which relief could be granted, thereby necessitating dismissal.[29] Bashian Bros. maintains that Plaintiffs have failed to articulate two essential elements of their section 2 claims with respect to Bashian Bros.: (1) the possession of monopoly power in the relevant market; or (2) a showing that there is a dangerous probability of Bashian Bros. achieving monopoly power. (*Id.*) Specifically, Bashian Bros. argues that "[s]ince plaintiffs have left out these essential elements in Counts II and IV with respect to Bashian Bros. *alone*, they have failed to state a claim upon which relief could be granted, and therefore, those counts must be dismissed." (Bashian Bros.' Br. at 2 n. 1.) (emphasis added).

■ By their very terms, section 2's monopolization and attempted monopolization claims prohibit unilateral action: "*Every person* who shall monopolize or attempt to monopolize ... any part of the trade or commerce ... shall be deemed guilty of a felony." 15 U.S.C. § 2 (emphasis added). Only in the proscription of conspiracies to monopolize does section 2 reach concerted action. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (Generally, "[t]he conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization."); *see also, Urdinaran*, 115 F.Supp.2d at 491 ("the focus of Section 2 is on unitary action rather than concerted activity"); *Appraisers Coalition*, 845 F.Supp. at 603 (In a conspiracy to monopo-

---

**29.** Plaintiffs' monopolization and attempted monopolization claims comprise Counts II and IV of the Second Amended Complaint. (Second Amended Compl. ¶¶ 31–32; 36–40.) Count III alleges conspiracy to monopolize. (*Id.* ¶¶ 33–35.) Although not so stated, this Court assumes that Bashian Bros. seeks to address Plaintiffs' section 2 conspiracy claim with its discussion of their section 1 conspiracy claim. Moreover, although Bashian

Bros. frames its request in the terms of a dismissal, pursuant to Fed.R.Civ.P. 12(b)(6), in its moving brief, this Court will analyze the sufficiency of Plaintiffs' allegations under the summary judgment standard. Bashian Bros.' notice of motion, brief title, and suggested standard of review suggest its intent to submit all of its claims as a motion for summary judgment.

lize claim, "individuals who are incapable themselves of monopolizing a market, may be found liable for intentionally joining others to do so."). Indeed, a "monopoly exists when *one firm* controls all or the bulk of a product's output, and no other firm can enter the market or expand output at comparable costs." Phillip E. Areeda, John L. Solow, and Herbert Hovenkamp, *Antitrust Law,* ¶ 403 at 7 (2002) (emphasis added).

In order to sustain their claims of monopolization and attempted monopolization, Plaintiffs must therefore prove the required elements against each individual defendant. However, Plaintiffs have not even addressed their monopolization claims with respect to the Bashian Bros. specifically. (*See* Pls.' Opp. to Bashian Bros.) Accordingly, this Court grants the Bashian Bros.' motion for summary judgment as to Plaintiffs' monopolization and attempted monopolization claims.

Based on Plaintiffs' failure to produce evidence tending to demonstrate Bashian Bros.' participation in any ORIA conspiracy, this Court similarly determines that Plaintiffs have not met their burden with respect to their conspiracy to monopolize claim against Bashian Bros. Although the elements for section 1 and section 2 claims are distinct, Plaintiffs' failure to demonstrate any participation on the part of Bashian Bros. in a boycott or other illegal scheme precludes both claims.[30] As a result, this Court also grants Bashian Bros.' summary judgment motion as to Plaintiffs' monopolization claims.

### C. The Etessami Defendants

The Etessami Defendants contend that "Plaintiffs are unable to show that Isaac Etessami and Etessami & Sons possess monopoly power, that they engaged in a conspiracy to monopolize, or that they engaged in anti-competitive behavior resulting in a dangerous probability of achieving monopoly power." (Etessami Defs.' Mem. at 14.)

### 1. Monopolization and Attempted Monopolization

The Etessami Defendants argue that Plaintiffs have failed to offer any evidence suggesting their possession of monopoly power or a dangerous probability of their achieving monopoly power. (*Id.*) Monopoly power is defined as "the power to control prices or exclude competition." *Houser v. Fox Theatres Management Corp.,* 845 F.2d 1225, 1230 (3d Cir.1988) (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). Both "monopoly power" and "a dangerous probability of achieving monopoly power" may be inferred from Defendants' possession of a significant market share. *See Pennsylvania Dental Assoc. v. Medical Serv. Assoc. of Pennsylvania,* 745 F.2d 248, 260 (3d Cir.1984); *Barr Labs.,* 978 F.2d at 112.

### a. Isaac Etessami

The Etessami Defendants first claim that there is no evidence that Etessami, as an individual, possesses monopoly power: (1) Etessami is not in the business of importing oriental rugs and therefore has no market share whatsoever; and (2) Etessami as an individual possesses no power to prevent newcomers from entering the market. (*See* Etessami Decl. ¶ 11.)

---

**30.** In fact, Plaintiffs acknowledge the interdependency of their claims. With regard to Defendant Etessami, Plaintiffs' attorney admitted, "If I win on the conspiracy claim, I'll win on those other counts. If I don't win on the conspiracy claim, he's right, I have nothing specific on Mr. Etessami on these counts. Either he's a member of the conspiracy that monopolizes and attempts to monopolize or tortiously interferes or isn't." (Tr. at 47–48.)

This Court agrees. In fact, Plaintiffs do not contend that Etessami, separate from Etessami & Sons, possesses market power. (Pls.' Opp. to Etessami Defs. at 29–32.) The Etessami Defendants' motion for summary judgment is therefore granted as to Plaintiffs' monopolization and attempted monopolization claims against Isaac Etessami. *See Appraisers Coalition*, 845 F.Supp. at 602–03 (dismissing plaintiffs' monopolization and attempted monopolization claims where no allegation with respect to market power of individual defendants).

### b. Etessami & Sons

■ The Etessami Defendants also argue that Plaintiffs have not shown that Etessami & Sons, by itself, possesses monopoly power. To the contrary, Plaintiffs contend that their monopolization and attempted monopolization claims may rely upon evidence of the Etessami Defendants' collective monopoly power, together with the other ORIA members:

> Plaintiffs do not contend that each individual conspirator was a monopolist. The allegation is that the conspirators jointly monopolized the market. A boycott that is intended to monopolize trade can be a violation of section 2, irrespective of whether the participants in the boycott individually have monopoly power. (Pls.' Opp. to Etessami Defs. at 29.)

In support of this proposition, Plaintiffs cite *Armstrong*, 185 F.3d at 157, and *Appraisers Coalition*, 845 F.Supp. at 602–03. (*Id.*) However, neither case suggests that section 2 monopolization and attempted monopolization claims may apply to con-

certed action. As noted above, only section 2's conspiracy to monopolize claim targets concerted action.

■ In effect, Plaintiffs are seeking to charge Defendants with conspiring to attempt to monopolize. The Sherman Act states no such offense. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 809 (2002). Moreover, even if Plaintiffs are suggesting that the Etessami Defendants, along with other ORIA members, maintained a "shared" monopoly, their claims are appropriately evaluated under section 1 or 2 conspiracy standards. *See id.* at ¶ 810.[31] Indeed, the Supreme Court has made clear that the Sherman Act's treatment of concerted and independent action is both distinct and purposeful. *See Copperweld*, 467 U.S. at 768–69, 104 S.Ct. 2731.

As Plaintiffs have failed to meet the elements of their monopolization and attempted monopolization claims against Etessami & Sons specifically, Defendants' motion for summary judgment as to these claims is granted.

### 2. Conspiracy to Monopolize

The Etessami Defendants' defense of Plaintiffs' conspiracy to monopolize claims is merely a regurgitation of their challenges to the evidence supporting Plaintiffs' section 1 claim. (Etessami Defs.' Mem. at 17; Etessami Defs.' Reply at 17.) This Court has already determined that Plaintiffs have raised a genuine issue as to whether the Etessami Defendants engaged in the ORIA conspiracy to undermine

---

**31.** Areeda and Hovenkamp explain, "[I]n some markets no single firm possesses sufficient power to be considered a "monopolist," but nevertheless a relatively few firms achieve monopoly-like output reductions and prices and thus might be said to possess "shared" monopoly power ... But when oligopolists

expressly conspire among themselves to carry on restrictive or exclusionary conduct that creates, maintains, or augments shared monopoly power, § 1 of the Sherman Act provides a remedy." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 810a (2002).

Plaintiffs' trade fairs. Indeed, the evidence suggests that one of the purposes of the conspiracy was to exclude Plaintiffs from the U.S. oriental rug market. This would support Plaintiffs' conspiracy to monopolize claim.

■ However, a section 2 conspiracy claim is harder to prove than a section 1 claim, particularly because the former requires a showing of specific intent. *Fleer*, 658 F.2d at 153. Few courts in this Circuit have evaluated the evidentiary showing necessary to establish a defendant's specific intent to monopolize. Other courts, however, have held that "the mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize because all lawful competition aims to defeat and drive out competitors." *Re/Max International v. Realty One, Inc.*, 900 F.Supp. 132, 153 (N.D.Oh.1995) (quotations omitted) (citing *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir.1986) and *Pacific Eng'g & Prod. Co. v. Kerr–McGee Corp.*, 551 F.2d 790, 795 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977)). "Under this view the specific intent inquiry focuses on 'predatory conduct' which is 'conduct that is in itself an independent violation of antitrust laws or that has no legitimate business justification other than to destroy or damage competition.'" *Re/Max International*, 900 F.Supp. at 153; *see also, Assoc. for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577, 585 n. 11, and 586 n. 13 (D.C.Cir.1984) (The specific intent to monopolize "refers to a purpose to acquire monopoly power by driving one's rival from the market by exclusionary or predatory means."). Moreover, although the

possession of monopoly power is not an element of a conspiracy to monopolize claim, proof of monopoly power may suggest an intent to monopolize. *Fleer*, 658 F.2d at 154.

Plaintiffs maintain that they have demonstrated a specific intent to monopolize on the part of Defendants. Plaintiffs rely upon the Third Circuit's reasoning for support: "the evidence offered by plaintiffs indicates that the defendants' conduct had the intended effect of undermining the trade shows, and that its only purpose was to eliminate competition in the United States" *Carpet Group*, 227 F.3d at 75. The Third Circuit determined that such evidence "raises the strong inference that ORIA and its member rug importer/wholesalers possessed some degree of market power." *Id.*

■ This Court first notes that the Third Circuit's analysis was in the context of evaluating whether Plaintiffs' allegations were subject to a "per se" analysis under section 1. Despite the fact that "market power" and "monopoly power" are often defined similarly,[32] "a showing of monopoly power requires ... something greater than market power under § 1." *Urdinaran*, 115 F.Supp.2d at 491 (citations omitted) (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)); *see also* Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law*, ¶ 801 at 318 ("[M]onopoly power ... is substantially understood to mean 'substantial' market power."). Thus, this Court is not bound by the Third Circuit's determination

---

**32.** For instance, "[m]arket power is the power to force a purchaser to do something he would not do in a competitive market; [i]t has been defined as the ability of a single seller to raise price and restrict output." *Eastman Kodak*, 504 U.S. at 464, 112 S.Ct. 2072 (citations omitted). "Monopoly power," similarly, has been defined as "the power to control prices or exclude competition." *E.I. du Pont de Nemours*, 351 U.S. at 391, 76 S.Ct. 994.

of "market power" in evaluating whether Defendants' possessed monopoly power.

 In order to show Defendants' intent to monopolize-either through direct evidence, or as an inference from their possession of monopoly power-Plaintiffs must produce evidence demonstrating that Defendants had the ability to exclude competition from the relevant market, or that Defendants retained a dominant share of the market.[33] *Pennsylvania Dental Assoc.*, 745 F.2d at 260; *E.I. du Pont de Nemours*, 351 U.S. at 391–92, 76 S.Ct. 994; *Great Escape*, 791 F.2d at 541. In this vein, the Third Circuit's finding that Plaintiffs' evidence indicates Defendants' intent to eliminate its U.S. competition is more instructive.[34] *Carpet Group*, 227 F.3d at 75. That the Third Circuit did not state such an intent specifically as to the Etessami Defendants is irrelevant. Defendants do not cite, nor could this Court find, any case law requiring that Plaintiffs prove a specific intent as to each individual member of the conspiracy. To the contrary, because this Court has already found a genuine dispute as to the Etessami's knowing participation in the ORIA conspiracy, evidence suggesting that other ORIA members possessed an intent to monopolize the oriental rug industry may be imputed to the Etessami Defendants.

 As Plaintiffs have produced evidence tending to demonstrate Defendants' specific intent to monopolize, Plaintiffs' conspiracy to monopolize claim may proceed to a jury. Accordingly, the Etessami Defendants' motion for summary judgment as to Plaintiffs' conspiracy to monopolize claim is denied.

## V. Tortious Interference

 "An action for tortious interference protects a business entity's right 'to pursue [its] business, calling or occupa-

---

33. Plaintiffs attempt to demonstrate monopoly power-and thereby intent-by proving Defendants' market share. Specifically, Plaintiffs aver that "the members of ORIA cumulatively have a market share in [the importing and wholesale distribution of oriental rugs] in excess of 75%." (Second Amended Compl. ¶ 22.) It is true that monopoly power is often gauged by a defendant's share of the relevant market. *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir.1994). However, Plaintiffs have not identified any market data, reports, studies or statistics corroborating their allegation that Defendants own 75% of the oriental rug market. Indeed, Plaintiffs admit that their hypothesis is based primarily upon Elsea's experience in the oriental rug industry. (Pls.' Opp. to Etessami Defs. at 30; Fierst Decl., Ex. 77.) This Court notes that to the extent that Elsea seeks to provide his own "expert" opinion testimony on this issue, without having followed the parameters of the federal rules, it is rejected. Plaintiffs also point to a letter from Hodges, as President of ORIA, to the Vice-President of Iran stating that "our members import the vast majority of handmade rugs into this country." (Fierst Decl., Ex. 78.) This evi-

dence, without more, is insufficient to support a finding of significant market share. *See generally Joseph Rossi v. Standard Roofing, Inc.*, 958 F.Supp. 976, 981 (D.N.J.1997) (Plaintiffs' bare assertions and conclusory allegations will not suffice to prevent summary judgment.).

34. The following evidence supports the Third Circuit findings: the letter from Laufer on ORIA letterhead to Chinese advertising account executive, admitting to encouraging retail magazines not to accept ads from manufacturers as "it could have very damaging effects on [importers]." (Fierst Decl., Ex. 5); the letter from Hodges on ORIA letterhead to Rustigian, head of ORRA, stating, "I think you are well aware of our sentiments regarding the purpose of this trade fair in undermining existing channels of distribution which have proven to be successful to all of us over the years." (*Id.*, Ex. 38); and the letter from Hodges on ORIA letterhead, to Carpet–E–World International, a trade publication, in which he warns, "Our Association will obviously take every measure possible to insure the continuation of a long established and successful form of distribution." (*Id.*, Ex. 60.)

tion free from undue influence or molestation.'" *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 750, 563 A.2d 31 (1989). A party complaining of tortious interference must demonstrate: "(1) that plaintiff had a reasonable expectation of an economic benefit or advantage; (2) that defendant knew of plaintiff's expectancy; (3) that defendant wrongfully and intentionally interfered with this expectancy; (4) a reasonable probability that but for defendant's wrongful interference, plaintiff would have realized the economic benefit; and (5) that plaintiff was injured as a result of defendant's conduct." *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F.Supp. 747, 771 (D.N.J. 1995) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 563 A.2d 31 (1989), and *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 186 (3d Cir.1992)).

▆▆▆ The Second Amended Complaint states causes of action against Defendants for both tortious interference with contractual relations and tortious interference with prospective economic advantages. (Second Amended Compl. ¶¶ 41–50.) The requirements for each claim are identical except that the tortious interference with contractual relations claim requires proof of an existing contract. *Coast Cities Truck Sales, Inc.*, 912 F.Supp. at 772. "Although businesses have the right to compete fairly with one another, that right does not extend to actions taken with the malicious purpose of harming a competitor's business. Thus, what is actionable is the luring away, by devious, improper and unrighteous means, of the customer of another." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir.1993) (citations omitted).

### A. Bashian Bros.

▆▆▆ For the same reasons that this Court has found that Plaintiffs have failed to produce evidence demonstrating Bashian Bros.' participation in the ORIA conspiracy, this Court notes the dearth of evidence suggesting that Bashian Bros. was aware of Plaintiffs' existing contracts, or that Bashian Bros. wrongfully or intentionally interfered with Plaintiffs' prospective contracts. Without such evidence, Plaintiffs' tortious interference claims must fail. *See Lightning Lube,* 4 F.3d at 1170. Accordingly, Bashian Bros' motion for summary judgment is granted as to Plaintiffs' tortious interference with contractual relations and tortious interference with prospective economic advantages claims.

### B. Etessami Defendants

The Etessami Defendants maintain that Plaintiffs have failed to prove the elements of either of their tortious interference claims. First, Defendants claim that there is no evidence suggesting Plaintiffs had a reasonable expectation of prospective business relations. For instance, Defendants point out that by his own testimony, Elsea considered his fairs to be huge successes. (Elsea Dep. at 559–66.) As such, Defendants contend that Plaintiff had no reasonable expectation in relation to parties who could have, but did not, purchase exhibition space at CGI's trade fairs. Similarly, Defendants argue that because Plaintiffs' ventures were based on an entirely new and unique method of selling oriental rugs in the U.S., Plaintiffs' expectations of success were not reasonable. Finally, Defendants claim that, assuming Plaintiffs had reasonable expectations of prospective business, Plaintiffs have failed to demonstrate that Defendants were aware of such contracts.

▆▆▆ "[I]t is axiomatic that a defendant cannot be held liable for interfering with a contract of which he or she was

unaware." *Lightning Lube,* 4 F.3d at 1170. Plaintiffs point to its communications with Zarnegian, Durusel, and Anadol as evidence of their expected business contracts. However, Plaintiffs' evidence as to Zarnegian and Durusel is inadmissible as hearsay, and thus may not be properly considered in support of Plaintiffs' opposition.[35] Accordingly, Plaintiffs only reliable evidence is related to Anadol: (1) Anadol's submission of a deposit for a booth at CGI's 1994 trade fair (Fierst Decl., Ex. 56); and (2) its subsequent letter refusing to participate and requesting that CGI alert ORIA to Anadol's non-participation (*Id.,* Ex. 58).

 Regardless, Plaintiffs fail to show how the Etessami Defendants willfully and maliciously interfered with the Anadol contract, or any other prospective contract. In fact, Plaintiffs argue that they need not show evidence of tortious interference as to the Etessami Defendants specifically: "The issue is not whether some isolated act by Etessami had a direct, one-to-one correspondence with an injury to plaintiffs. Etessami was a participant in a conspiracy as an individual and as an agent of Etessami & Sons. The conspiracy inflicted injury." (Pls.' Opp. to Etessami Defs. at 35.) To the contrary, Defendants correctly note that Plaintiffs' tortious interference claims require proof that the Etessami Defendants "not only knew of plaintiffs' alleged business expectations and contracts, but that they willfully interfered with those expectations and contracts, and that such interference caused real damages that plaintiffs would otherwise not have suffered." (Etessami Defs. Reply at 18.) *See*

*Fineman,* 980 F.2d at 186 (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 N.J. 739, 563 A.2d 31, 37 (1989)). Plaintiffs' attempt to rely upon evidence of an ORIA conspiracy—and the Etessami Defendants' participation in that conspiracy—in support of their tortious interference claims is therefore inapposite.

Although "the factual underpinnings of such intentional interference claims generally are intertwined with the antitrust claims they accompany, ... that statement does not imply that claims of intentional interference with contractual relations must always survive summary judgment if a plaintiff's antitrust claims survive." *Alvord–Polk,* 37 F.3d at 1014 (quotations omitted) (granting defendant's partial summary judgment as to plaintiffs' claims for tortious interference with existing and prospective contracts, despite evidence supporting plaintiffs' section 1 claims). Since Plaintiffs have not produced evidence tending to demonstrate that the Etessami Defendants, in particular, interfered with their existing and prospective business relations, this Court grants the Etessami Defendants' motion for summary judgment as to these claims.

### CONCLUSION

For the reasons stated above, this Court denies the Newman Defendants' motion for summary judgment based on the *Noerr–Pennington* doctrine. Bashian Bros.' motion for summary judgment is granted as to all of Plaintiffs' claims.

This Court denies the Etessami Defendants' motion for summary judgment as to

---

35. Plaintiffs' attempt to rely upon notes from conversations with ORIA members Zarnegian and Durusel, and a Floor Covering Weekly ("FCW") representative to support their allegation of ORIA's market power is misplaced. Plaintiffs have not provided testimony from Zarnegian, Durusel or the FCW representa-

tive corroborating their alleged conversations with Defendants. Thus, like Plaintiffs' notes regarding O'Callaghan from Decorative Rug Magazine, these communications are hearsay, and thus not appropriate for this Court's consideration. *See* discussion *supra* p. 276.

Plaintiffs' section 1 and section 2 conspiracy to monopolize claim. This Court grants the Etessami Defendants' motion for summary judgment as to Plaintiffs' monopolization, attempted monopolization and tortious interference claims.